**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| JULIA RUSSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| MOORE INGRAM JOHNSON & | ) | |
| STEELE, LLP, | ) | **Jury Demanded** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Comes Plaintiff Julia Russo, by and through counsel, and, for her Complaint against Defendant Moore Ingram Johnson & Steele, LLP, states as follows:

### Summary of the Action

1.      Defendant, which is a law firm, terminated Plaintiff, its legal assistant employee. When Plaintiff, while she was on Family and Medical Leave Act ("FMLA") leave, professionally sought to explore the possibility of Defendant accommodating her request to be permitted to work remotely, Bill Johnson, one of Defendant's lawyer employees who serves as Defendant's Administrative Partner (the highest member of management) wrote to other members of management "let's accom[mo]date her by firing her". When other subordinate members of management pointed out in response that Defendant should consider Plaintiff's rights because of her disability (anxiety regarding COVID safety noted by Plaintiff's physician), Mr. Johnson wrote "Think my suggestion is best." Thereafter, Defendant interfered with Plaintiff's FMLA rights and terminated Plaintiff based on her disability, perceived disability, exercise of FMLA rights, and refusal to remain silent about Defendant's illegal activities. Defendant also did not pay Plaintiff required FFCRA paid leave.

**Jurisdiction and Venue**

2.      This Court has jurisdiction under 28 U.S.C. § 1331 as Plaintiff's claims arise under federal law, including the FMLA (29 U.S.C. § 2601 *et seq*.) and the Families First Coronavirus Response Act.

3.      This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under Tennessee common law because they are so related to Plaintiffs' claims under the FMLA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiffs' claims under the FMLA.

4.      Venue is proper in this District under 28 U.S.C. § 1391(b) as (A) Defendant operates a law firm that practices law in courts located in the District of this Court, (B) Defendant maintains an office in Brentwood, Williamson County, Tennessee, within the District of this Court, and (C) prior to her illegal termination, Plaintiff worked for Defendant in Brentwood, Williamson County, Tennessee, within the District of this Court.

**Facts**

5.      Defendant is a law firm; Defendant at all times relevant to this action employed more than 50 employees and was thus subject to the FMLA and the Tennessee Disability Act (T.C.A. § 8-50-103).

6.      Plaintiff began working for Defendant as a legal assistant in August, 2018.

7.      At all times after August, 2019 until Plaintiff's termination, Plaintiff had worked for Defendant for more than one year, had worked more than 1,250 hours in the twelve preceding months, and was a qualifying employee under the FMLA.

8.      Defendant at all times relevant employed less than 500 employees, and was accordingly subject to the Families First Coronavirus Response Act.

9.      Defendant maintained an employee handbook.

10.      In the employee handbook, Defendant provided that:

**4.5 Leaves of Absence Policy**

LOA Defined: A leave of absence (LOA) is defined as an unpaid, approved absence from work for a specified period of time for medical, parental, military or personal reasons. Moore Ingram Johnson & Steele complies with all requirements of the Family Medical Leave Act (FMLA). If an employee finds that he or she must be out of work for more than three days, he or she should contact the Human Resource Director to determine if a LOA may be necessary.

Notice: An employee must provide 30 days advance notice when the need for the LOA is foreseeable; for instance, if medical treatments or other events are planned or known in advance. If the LOA is not foreseeable, the employee must provide notice as soon as practicable.

Documentation Required: Any medical leave will require written proof of the medical reason for the leave from the employee's doctor or the employee's qualifying family member's doctor. All such proof is subject to verification by Moore Ingram Johnson & Steele's doctor. Absence without such proof may be deemed grounds for termination. Medical documentation may also be required to establish that the employee is fit to return to work following LOA.

Personal LOA: During the first year of employment, no leave for personal reasons, paid or unpaid, will be granted. After the first year, requests for personal leave will be considered on a case-by-case basis, and the granting of such leave and its terms will be totally at the discretion of management. Personal leave, if authorized, will carry with it a guarantee of employment upon return, but not necessarily in the same position previously held.

LOA Time Frame: The maximum amount of LOA time an employee is allowed to take in any combination of LOAs is 12 weeks in a 12-month time period measured backward from the date an employee begins a LOA (rolling period). While on LOA, employees are required to use any accrued sick and vacation days.

Benefits While on LOA: Moore Ingram Johnson & Steele will pay its portion of the cost of the employee's benefits including health, life and disability insurance benefits while an employee is on an approved FMLA covered LOA. The employee must continue to pay his or her portion of the benefits which may be made by payroll deductions (when applicable), or by check which must be submitted to the Human Resources Director each pay period unless other arrangements have been made. If the employee fails to pay his or her portion of the benefits for more than 30 days, the employee's coverage(s) will be terminated and he or she will be offered COBRA to continue the applicable policies.

Return to Work: Failure to return to work upon the expiration of LOA, or refusing an offer of reinstatement for which the employee is qualified will also result in voluntary termination.

11.     Upon information and belief, although Defendant had FMLA-eligible employees, including Plaintiff, Defendant did not include in its employee handbook the required information regarding the FMLA and employee's rights thereunder as required by 29 C.F.R. § 825.300(a)(3).

12.     Upon information and belief, Defendant also did not distribute a copy of the information required by 29 C.F.R. § 825.300(a)(3) upon hiring.

13.     Upon information and belief, Defendant did not during any part of the time Plaintiff worked at Defendant's Brentwood office post and keep posted on its premises in any conspicuous place in Defendant's Brentwood office a notice explaining the FMLA's provisions and providing information concerning procedures for filing complaints of violation of the Act with the Wage and Hour Division, in violation of 29 C.F.R. § 825.300(a)(1)

14.     Plaintiff had a family history of Guillain-Barre syndrome; Plaintiff's father, maternal grandfather and maternal aunt have suffered from this condition.

15.     Upon the advent of the COVID-19 pandemic, Plaintiff began suffering from severe anxiety relating to being potentially exposed to COVID-19, and how she, as a person with a family history of Guillain-Barre syndrome, would be particularly at risk of death or serious illness if she contracted COVID-19.

16.     Defendant's management had a lax attitude toward preventing COVID-19 transmission, and this exacerbated Plaintiff's anxiety.

17.     For example, upon information and belief, in March or April, 2020, Troy Hart, a lawyer and partner and/or member and/or shareholder and/or partial owner of Defendant (who Defendant has designated as its registered agent within the State of Tennessee), sent a firmwide

(to all attorneys and staff) email mocking concern regarding COVID-19 and referring to COVID-19 as the "China Virus."

18.     When the coronavirus/COVID-19 pandemic began surging through the Nashville, Tennessee area, Defendant took very little protective measures with respect to the legal assistants employed at its firm.

19.     For example, Defendant did not require employees to wear masks.

20.     Defendant also did not take steps to inform employees when other employees reported to Defendant that they had been possibly exposed to coronavirus; employees would instead only learn of such events by inquiring about the absent person (or when the possibly-infected co-worker would communicate about the possible infection to co-workers).

21.     Defendant did not take steps to cause employees to work staggered shifts or otherwise to reduce the number of persons physically present at the office.

22.     Defendant's Brentwood office is relatively small and had an "open" floorplan under which persons present would not be separated by walls or other barriers to prevent exposure to airborne coronavirus from a contagious person.

23.     Further, the Brentwood office is located in an office building, and, even if the confines of Defendant's office itself were entirely safe (they were not), employees working in the office would pass through common areas shared by employees of other companies not under Defendant's control, and would have to use the restroom in common restrooms shared with employees of other companies not under Defendant's control.

24.     On March 24, 2020, Defendant, through its Firm Administrator Tony Lemons, sent an email to all of Defendant's "staff" employees relating to COVID-19, specifically noting that

"understandably, if you are concerned about continuing to work during this situation and wish to remain at home on an unpaid basis, you are welcome to do so."

25. A copy of Mr. Lemons's March 24, 2020 Email is attached as Exhibit 1.

26. One of Plaintiff's co-workers, Lindzi Pipkin, lived with her boyfriend, Kyle.

27. On Sunday, April 19, 2020, Kyle began experiencing symptoms consistent with those of COVID-19.

28. Over the next two days (Monday, April 20, 2020 and Tuesday, April 21, 2020), Ms. Pipkin reported to work and worked in Defendant's office without a face covering in proximity to her co-workers, including Plaintiff; during this time period, Ms. Pipkin herself began experiencing symptoms, including a sore throat, which she initially attributed to seasonal allergies.

29. By the morning of Wednesday, April 22, 2020, Ms. Pipkin reported to Greg Fuller, the supervising attorney for the Brentwood office, that her boyfriend had been experiencing symptoms since Sunday, that she herself had "stuff" that she had previously thought were allergies but she was now concerned could by COVID-19, and that both she and her boyfriend were going to be tested for COVID-19.

30. Ms. Pipkin also texted her co-workers, including Plaintiff, that she and Kyle were being tested for COVID-19.

31. Plaintiff was at Defendant's office when she received Ms. Pipkin's text; upon receiving the text message, feeling that it was unsafe to be present at Defendant's office due to Ms. Pipkins' potential exposure, as well as the potential exposure of Plaintiff's co-workers at Defendant's office with whom Ms. Pipkin had worked the two preceding days while Ms. Pipkin and Kyle (with whom Ms. Pipkin lived) were experiencing symptoms consistent with COVID-19 exposure, Plaintiff left Defendant's office.

32.     At 9:24 a.m. on Wednesday, April 22, 2020, Defendant Office Manager for the Brentwood and Knoxville offices, Jody Scott, sent an email to Defendant's Human Resources Manager, Catherine Larkins, stating that Ms. Pipkin's "boyfriend is getting tested for COVID" but that "[s]he has stated she is not having symptoms"; however, in an "update" in the same email, the email reported that "She actually was thinking her stuff was allergies but now she is wondering."

33.     A copy of Ms. Scott's April 22, 2020 9:24 a.m. email is attached hereto as Exhibit 2.

34.     Beginning at 9:32 a.m, and concluding prior to 10:13 a.m. on Wednesday, April 22, 2020, Plaintiff then had a text exchange with Greg Fuller as follows:

Julia:          Hey Greg! I just got a text from Lindzi that she is staying out today because her bf is getting tested for Covid and she[']s had a sore throat the past week.  I have been really stressed about this and feel really uncomfortable now coming in especially since I[']m at a higher risk and think I am going to take the day today.  Sorry to let you know last minute but I just got her text.

Greg:          I understand you're stressed.  We all are.  Next time please call before leaving as it's making it more difficult for everyone.

Julia:          Sorry for not calling in advance but I just got Lindzi's text when I got to the office and texted you as soon as I got it or I would ha[v]e let you known sooner.

35.     A copy of Plaintiff's text exchange with Mr. Fuller is attached hereto as Exhibit 3.

36.     On Thursday, April 23, 2020 at 7:59 a.m., Defendant's Office Manager (over the Brentwood and Knoxville offices) Jody Scott emailed Defendant's Human Resources Manager, Catherine Larkins, writing that Ms. Pipkin had been tested and would be off for the remainder of week and that:

Her time off will be excused under FFCRA I assume.

Julia Russo on the other hand left immediately when she got to the office yesterday as she heard that Lindzi's b/f may have it so she is choosing to use PTO until results

are back.  She feels she is at a higher risk as her father has an auto-immune disease so she feels it is best for her to stay out.  [H]er father is in New Jersey, so I guess she feels she may have inherited the disease and doesn't want to take any chances….

37.    A copy of Ms. Scott's April 23, 2020 7:59 a.m email is part of the email string attached hereto as Exhibit 4, which consists of emails between Defendant's management employees.

38.    Later on Thursday, April 23, 2020, Plaintiff sent Mr. Fuller and Ms. Scott a text message stating as follows:

Hey guys!  As you know I've been really stressed from everything with Covid-19 and have been having some stomach issues due all the anxiety.  I talked to my dad's neurologist this morning who cautioned I should probably stay at home due to me being in a higher risk pool.  I then spoke with another doctor this morning who agreed and is faxing over a note to the office to either stay at home or work remotely for at least a month.  You know how much I value you guys and my job and if I can be accommodated working from home I would be super grateful.  If not I understand but I think it's best for my physical and mental health to stay out until it is less of a risk.

39.    A copy of this text is attached as Exhibit 5.

40.    Upon receipt of this text, Defendant's Office Manager, Jody Scott, forwarded the text message by an email dated April 23, 2020 at 11:47 a.m. to Defendant's Human Resources Manager Catherine Larkins, Defendant's Firm Administrator Tony Lemons, and Defendant's Administrative Partner, Bill Johnson.

41.    Ms. Scott's April 23, 2020 11:47 a.m. email is part of the email string attached hereto as Exhibit 6.

42.    In Ms. Scott's April 23, 2020 11:47 a.m. email, Ms. Scott acknowledges that Ms. Pipkin's "boyfriend has had symptoms of Coronavirus since Sunday," and yet characterized Plaintiff's action as "freak[ing] out," writing that "[w]ell Julia go to the office and received a text [from] Lindzi that was sent to all the Legal Assistants explaining why she was out and Julia freaked

out and immediately went home and text Greg to advise she doesn't feel safe at work knowing Lindzi's b/f is getting tested."

43. Defendant's Administrative Partner Bill Johnson responded the same day "Not letting them work from home. Lets set call for 4."

44. This email response of Mr. Johnson is contained in the email string attached hereto as Exhibit 6.

45. Upon information and belief, a call occurred during the afternoon of April 23, 2020, during which Mr. Johnson expressed hostility towards the idea of any legal assistant working from home, or receiving FMLA leave based on medical concerns regarding COVID-19, and further expressed that Defendant should not, in his opinion, retain employees who would not continue working through the pandemic.

46. Upon information and belief, Mr. Johnson specifically instructed Mr. Fuller and Ms. Scott to emphasize to Plaintiff that if she did not return to work after her paid time off was exhausted at the end of the day on Monday, April 27, 2020, she would only have a job under unpaid FMLA leave if her FMLA was approved, and to emphasize the uncertainty of whether FMLA leave would be approved.

47. On April 24, 2020, Plaintiff's doctor faxed to Defendant a document stating "[f]or Medical reasons, please excuse [Plaintiff] from work for the following dates: 23 April – 23 May (OK to work from home if available)."

48. A copy of this note, as faxed to Defendant, is attached hereto as Exhibit 7.

49. Ms. Scott forwarded this note to Ms. Larkins and Mr. Fuller, by email dated April 24, 2020 at 10:24 a.m. (a copy of which is included in the email string attached hereto as Exhibit 6) in which she stated that "I suggest we tell her we have the excuse, but she only has PTO through

Monday, so on Tuesday she begins unpaid. If she would like to file for FMLA she will have to have a doctor fill out the forms and submit back to us then her job is guaranteed for 12 weeks as unpaid."

50.    This email of Ms. Scott is contained within the email string attached hereto as Exhibit 6.

51.    Later on April 24, 2020, the supervising attorney of the Brentwood office, Greg Fuller, emailed Ms. Scott, Ms. Larkins, Mr. Lemons and Mr. Johnson, with the email title "Lindzi Pipkin Negative"; the text of the email stated "But take a look at this text I just got regarding the physician not believing the test result for her boyfriend."

52.    A copy of Mr. Fuller's email, reflecting that a .jpg format image file was attached to the email (but without a copy of the attachment), is part of the email string attached hereto as Exhibit 8.

53.    Upon information and belief, the email attachment was a screenshot of a text from Lindzi Pipkin stating that both her and her boyfriend had tested negative, but that the physician who had consulted with her boyfriend believed that, based on his symptoms, the boyfriend's negative test result could be or was a false negative and that the boyfriend could have and be symptomatic with COVID-19.

54.    Tony Lemons responded by email, writing "based on a negative test, and her stated acknowledgement that she exhibits no symptoms, and is ready to return to work, I would say she's good to so. All you have to go by is the negative test. His symptoms could be the flu even. It appears the doctor is not quarantining her, only him."

55.    This email is contained within the email string attached hereto as Exhibit 8.

56.     After Mr. Lemons's "she's good to go" email, Mr. Fuller wrote "[w]hatever we do, we'll have to assume that she will let the others know what the doctor says about her boyfriend," to which Mr. Johnson immediately responded "That's my concern."

57.     These emails are contained within the email string attached hereto as Exhibit 8.

58.     Ms. Larkins noted that "[i]n other circumstances folks have returned to the office after negative results but we haven't had a situation where someone thinks it's a false negative;" Ms. Scott likewise noted "Lindzi's is a different circumstance whereas a teledoc is disagreeing with the COVID test results due to the symptoms."

59.     These emails are contained with the email string attached hereto as Exhibit 8.

60.     Mr. Fuller ultimately asked "[c]an we tell Lindzi to stay out next week and we'll see how it goes, and stick to our plan from yesterday on Julia?  We were planning on calling Julia at 4:00 est to let her know her options as her PTO runs out after Monday;" Mr. Johnson responded "yes."

61.     These emails are contained with the email string attached hereto as Exhibit 8.

62.     Thereafter, Jody Scott and Greg Fuller talked with Plaintiff and explained to Plaintiff that Plaintiff could return to work or "try to get" FMLA.

63.     Defendant's summary of this conversation is attached hereto as Exhibit 9, and reflects that Defendant minimized the COVID-19 pandemic and thus Plaintiff's legitimate concerns relating thereto, noting "[t]he flu is worse than this coronavirus."

64.     Thereafter, on Monday, April 27, 2020 at 1:05 p.m., Ms. Scott wrote an email update on two subjects, entitled "Lindzi/Julia".

65.     With respect to Ms. Pipkin, who Mr. Lemons had declared "good to go" back to work the Friday before, Ms. Scott related that "she is ready to come back to work if we will let

her. Kyle was not tested a second time, the teledoc is his physician and when explained the sequence of symptoms the doctor said it sure sounded like COVID and quarantining him for 2 weeks. He and Lindzi live together so she has been around him the entire time. Kyle is feeling a little better. His breathing last night was really hard but Lindzi's mom is a respiratory therapist and gave them some breathing treatments so he has been doing those to help with the breathing."

66. With respect to Plaintiff, Ms. Scott wrote that "Greg and I spoke to Julia, she is going to let us know by 5:00 what her decision is as to coming back, trying to get FMLA or her decision of what she wants to do."

67. This email is attached hereto as Exhibit 10.

68. Later on the afternoon of April 27, 2020, Ms. Scott again emailed Ms. Larkins and Mr. Fuller, writing "Update: Julia wants to try the FMLA route. I've faxed the paperwork to her doctor. Catherine, does she have insurance through us and how much will it cost each paycheck if so? I want to make her aware of this expense. I seriously don't know how she could qualify for FMLA."

69. This email is attached hereto as Exhibit 11.

70. Plaintiff's physician completed the FMLA document Defendant sent to Plaintiff's physician, and returned it to Defendant on April 29, 2020; a copy of the completed document is attached as Exhibit 12.

71. Ms. Scott forwarded the physician's completed FMLA document to Ms. Larkins and Mr. Fuller on April 30, 2020, writing "I received this from Julia's doctor this morning. He is excusing her through June 1. I will need to get this to Julia for her to fill out the bottom portion of first page and sign this"; a copy of this email is attached as Exhibit 13.

72. Plaintiff promptly on April 30, 2020 completed the first page of the document; attached hereto as Exhibit 14 is the FMLA document as completed by Plaintiff's physician and Plaintiff as Defendant maintained this document in its files.

73. Defendant did not at any point, including within five business days of either Plaintiff's April 27, 2020 communication to Defendant that she was requesting FMLA leave or her April 30, 2020 submission of the FMLA documents requested by Defendant, provide Plaintiff with an eligibility notice as required by 29 C.F.R. § 825.300(b).

74. Plaintiff's medical condition constituted a serious medical condition entitling Plaintiff to FMLA leave.

75. Defendant did not at any time inform Plaintiff that it questioned whether or not Plaintiff had the medical condition for which she requested FMLA leave, or that it required further information from Plaintiff to determine whether Plaintiff qualified for FMLA leave, or that it questioned whether medical leave was medically necessary or appropriate for Plaintiff's medical condition.

76. To the contrary, Defendant concluded on or immediately after April 30, 2020 based on Plaintiff's request for FMLA leave and supporting documents that Plaintiff was entitled to FMLA leave as Plaintiff had requested.

77. Upon information and belief, Defendant did not provide a rights and responsibilities notice to Plaintiff as required by 29 C.F.R. § 825.300(c).

78. Upon information and belief, Defendant did not provide a designation notice to Plaintiff as required by 29 C.F.R. § 825.300(d).

79. In the alternative, upon information and belief, if Defendant provided a designation notice to Plaintiff as required by 29 C.F.R. § 825.300(d), Defendant did not provide notice to

Plaintiff with the designation notice that Defendant would require the employee to present a fitness-for-duty certification to be restored to employment.

80.     Indeed, upon information and belief, prior to Mr. Johnson's July 22, 2020 email (discussed in more detail below), Defendant did not at any time inform Plaintiff that it would require Plaintiff at the conclusion of her FMLA leave to provide a medical certificate from her physician or other health-care provider that she was able to return to work in Defendant's office.

81.     Upon information and belief, Defendant has not consistently required of persons taking leaves of absence from Defendant's employment that each such persons provide a medical certificate of his or her physician or other health-care provider that he or she was able to return to work for Defendant.

82.     From April 23, 2020 until her termination, Plaintiff was an employee unable to work for Defendant and advised by a health care provider to self-quarantine due to concerns related to COVID-19 under 29 C.F.R. § 826.20(a)(1)(ii) and, specifically, a belief and concern of both Plaintiff and Plaintiff's health care provider (with respect to which Plaintiff's health care provider advised Plaintiff) that Plaintiff was particularly vulnerable to COVID-19; Plaintiff was prevented from working because (A) Defendant refused to let Plaintiff (or any of its employees) work remotely and (B) Plaintiff's health care provider medically advised Plaintiff to not work for Defendant at Plaintiff's normal workplace (Defendant's Brentwood office).

83.     Plaintiff was a full-time employee of Defendant, as defined in 29 C.F.R. § 826.21(a).

84.     Defendant did not provide Paid Sick Leave to Plaintiff, as required by under 29 C.F.R. § 826.20(a).

85.     Defendant itself concluded Plaintiff was eligible for FFCRA leave, but did not inform Plaintiff of this conclusion.

86.     Defendant did not advise Plaintiff of how Plaintiff being eligible for paid FFCRA would impact her FMLA leave and/or allow Plaintiff to extend her FMLA leave.

87.     On May 27, 2020, Plaintiff texted Ms. Scott the following "Hi Jody, I just had my doctor's appointment and he feels given the rise in cases and lack of accommodation, it is in my best interest medically to continue to stay on leave and not return June 1st.  If you wouldn't mind faxing him over the paperwork again he will get it fill out and returned to you today.  His fax # is … Thanks so much and hope all is well with you and that you're staying safe;" Ms. Scott emailed this text message to Ms. Larkins, and a copy of the email forwarding the text message is attached hereto as Exhibit 15.

88.     In response to Plaintiff's May 27, 2020 text to Ms. Scott, Defendant forwarded paperwork to be completed by Plaintiff's physician, which Plaintiff's physician completed; this paperwork was returned to Defendant.

89.     A copy of the FMLA paperwork Defendant requested Plaintiff's physician complete, as completed by Plaintiff's physician, is attached hereto as Exhibit 16.

90.      Based on Plaintiff's request for FMLA leave past June 1, 2020 and the supplemental paperwork regarding FMLA leave past June 1, 2020 (through "July 2020"), Defendant concluded that Plaintiff was entitled to FMLA leave as Plaintiff had requested.

91.     On July 8, 2020, Plaintiff wrote an email entitled "FMLA" to Ms. Scott and Mr. Fuller, stating:

Dear Jody & Greg:

Hope you both are well and staying safe. As you know, my FMLA is set to expire next week on July 16, 2020.[1] After a follow-up appointment with my treating physician this morning, he still thinks it is within my best interest medical to once again tentatively extend my FMLA or be accommodated to work from home given the surge in COVID-19 cases specifically in Tennessee. He is still perplexed as to why I have not been accommodated, and quite honestly, I was not able to give him an explanation as I was also bever given one. When I was still at the office, attorneys were rotating between working in the office and working at home. If they can be accommodated, shouldn't those same accommodations be made to all staff? Especially those who are at a higher risk? Given the American Disabilities Act, I do not understand why reasonable accommodations can not be granted for me, given that my role and responsibilities can be achieved remotely. My full intent is, and always has been, to return to my position. My request is not arbitrary, but is medically documented and necessary. I have an increased susceptibility to complications from Covid-19 as a result of a genetic predisposition and family medical complications. Thank you!"

92.    This email is part of the email string attached hereto as Exhibit 17.

93.    Mr. Fuller forwarded Plaintiff's July 8, 2020 email to Mr. Lemons, Ms. Larkins, Ms. Scott and Mr. Johnson, writing "FYI"; a copy of this email is part of the email string attached hereto as Exhibit 17.

94.    Mr. Johnson responded to Mr. Fuller's email later in the afternoon of July 8, 2020; the subject of the email was "Re: FMLA" and the text of Mr. Johnson's email stated, in full, "Lets accomidate [sic] her by firing her. Suse[ptibility [sic] to covid is not a disability".

95.    Mr. Johnson's email containing his suggestion that Defendant "accom[mo]date [Plaintiff] by firing her" is part of the email string attached hereto as Exhibit 17.

96.    Plaintiff was, at the time Mr. Johnson suggested firing Plaintiff, on FMLA leave and entitled to return to work at the conclusion of her FMLA leave.

---

[1]    Plaintiff had paid time off through the end of the day on Monday, March 27, 2020. Her FMLA leave started thereafter. Accordingly, even if she were not entitled to two weeks of paid FFCRA leave, her 12 weeks of FMLA leave would have begun on Tuesday March 28, 2020 and ended on Monday, July 20, 2020. Plaintiff was mistaken relating to the end of her FMLA leave because Defendant did not provide the required notices under 29 C.F.R. § 825.300.

97. Upon information and belief, Defendant's Human Resources Manager Catherine Larkins knew as soon as she reviewed Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" that Mr. Johnson's suggestion was inappropriate.

98. Mr. Johnson was, at the time of sending his email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her," a lawyer and the Administrative Partner of Defendant, a law firm.

99. Upon information and belief, Defendant's Human Resources Manager Catherine Larkins knew as soon as she reviewed Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" that Mr. Johnson's suggestion indicated that Mr. Johnson's email suggested that Mr. Johnson intended to have Defendant retaliate against Plaintiff for exercising her legal rights, including her right to use FMLA leave.

100. Upon information and belief, in response to Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her," Defendant's Human Resources Manager took no action to ensure that Defendant's supervising board, any other person not already a part of the email thread, became aware of Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her."

101. Upon information and belief, Ms. Larkins also took no action to point out to Mr. Johnson that his email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" was inappropriate.

102. Instead, later on July 8, 2020, Ms. Larkins wrote an email to Mr. Johnson and Mr. Lemons, specifically noting that it was "[o]nly to the two of you."

103.     Ms. Larkins' email responding to Mr. Johnson's email (containing his suggestion that Defendant "accom[mo]date [Plaintiff] by firing her") is part of the email string attached hereto as Exhibit 17.

104.     In Ms. Larkins' email, she pointed out that, while Mr. Johnson had noted that "sus[ce]ptibility to covid is not a disability" in his email suggesting firing Plaintiff, Plaintiff's physician had, in the FMLA paperwork, actually asserted that she suffered from "situational anxiety."  See Larkins email, part of email string attached hereto as Exhibit 15 ("See attached for her original FMLA paperwork.  Specifically, page 2, # 3.  Doctor notes family autoimmune but not that Julia has it.  *She could possibly base it on her anxiety from an ADA perspective though.*") (emphasis added).

105.     Upon information and belief, the document attached hereto as Exhibit 14 was attached to the Larkins "Only to you two" email to Mr. Johnson and Mr. Lemons dated July 8, 2020.

106.     Upon information and belief, Ms. Larkins sent this email only to Mr. Lemons and Mr. Johnson because (A) she knew that Mr. Johnson had suggested that Defendant take illegal action against Plaintif in suggesting that Defendant "accom[mo]date [Plaintiff] by firing her", (B) she did not intend to take action to prevent Mr. Johnson from causing Defendant to take illegal action against Plaintiff and (C) she wanted to limit the number of persons who would be able to see her response to Mr. Johnson because the response acquiesced to the inappropriate suggestion by Mr. Johnson by failing to note that it was inappropriate.

107.     Upon information and belief, by excluding Mr. Fuller and Ms. Scott from the email containing Ms. Larkins's response to Mr. Johnson's inappropriate suggestion that Defendant "accom[mo]date [Plaintiff] by firing her", Ms. Scott hoped that Mr. Fuller and Ms. Scott might

believe, contrary to Ms. Larkins's actual plan (which was to take no action to prevent Mr. Johnson from causing Defendant to take illegal action against Plaintiff) that Ms. Larkins had taken appropriate action both to point out the inappropriateness of Mr. Johnson's suggestion that "Defendant "accom[mo]date [Plaintiff] by firing her" and to prevent Defendant from taking illegal action against Plaintiff.

108.    Upon information and belief, Mr. Lemons reviewed on July 8, 2020 both the email contained within exhibit 17 of Mr. Johnson suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" and Ms. Larkins's email contained in Exhibit 17 in response thereto written "Only to you two" (i.e., only to Mr. Lemons and Mr. Johnson).

109.    Upon information and belief, in response to Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her," Mr. Lemons took no action to ensure that Defendant's supervising board, any other person not already a part of the email thread, became aware of Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her."

110.    Upon information and belief, Mr. Lemons also took no action to point out to Mr. Johnson that his email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" was inappropriate.

111.    Instead, Mr. Lemons responded to Ms. Larkins's and Mr. Johnson's emails by sending an email to Ms. Larkins and Mr. Johnson; this email responded to Mr. Johnson's point that "sus[cep]tibility to covid is not a disability," stating "[i]f you read the stated reason for the FMLA certification by the doctor, it is actually for 'situational anxiety'"; a copy of this email, also sent on July 8, 2020, is part of the string of emails attached hereto as Exhibit 17.

112.    Two minutes after Mr. Lemons's email, Mr. Johnson responded to Mr. Lemons's email, writing "Think my suggestion is the best."

113.     A copy of Mr. Johnson's email that "Think my suggestion is the best" is part of the string of emails attached hereto as Exhibit 17.

114.     Upon information and belief, in referring to "my suggestion," Mr. Johnson was referring to his suggestion earlier the same day and in the same email string, that Defendant "accom[mo]date [Plaintiff] by firing her".

115.     Upon information and belief, both Ms. Larkins and Mr. Lemons reviewed Mr. Johnson's "Think my suggestion is the best" email on July 8, 2020.

116.     Upon information and belief, at the time Ms. Larkins and Mr. Lemons reviewed Mr. Johnson's "Think my suggestion is the best" email, both Mr. Lemons and Ms. Larkins believed that Mr. Johnson (A) had reviewed the emails of Mr. Lemons and Ms. Larkins following Mr. Johnson's email suggesting that Defendant "accom[mo]date [Plaintiff] by firing her" and (B) was referring by the words "my suggestion" to his suggestion earlier the same day and in the same email string, that Defendant "accom[mo]date [Plaintiff] by firing her".

117.     Upon information and belief, neither Mr. Larkins nor Mr. Lemons did anything to ensure that Defendant's supervising board, any other person not already a part of the email thread, became aware of Mr. Johnson's email insisting that "[his] suggestion" (which was to "accom[mo]date [Plaintiff] by firing her") "is the best" in response to Mr. Lemons's email noting that Plaintiff's disability and rights associated therewith should be considered.

118.     Upon information and belief, neither Mr. Larkins nor Mr. Lemons took any action to point out to Mr. Johnson that it was inappropriate for him to insist that "[his] suggestion" (which was to "accom[mo]date [Plaintiff] by firing her") "is the best" in response to Mr. Lemons's email noting that Plaintiff's disability and rights associated therewith should be considered.

119.    Defendant's management then engaged in other internal discussions by email regarding Plaintiff, copies of which are attached hereto as Exhibits 18, 19 and 20.

120.    One of Defendant's management hand-wrote the words "Extend FMLA 30 days. We are not going to hold your job" onto a printed version of an email string; this document, which is attached as Exhibit 20, was not delivered to Plaintiff until the year 2021.

121.    Upon information and belief, these words were hand-written on Exhibit 20 on July 13, 14 or 15, 2020, prior to Bill Johnson's July 15, 2020 email described below.

122.    Upon information and belief, the person who hand-wrote these words on Exhibit 20 was Tony Lemons.

123.    In the alternative, upon information and belief, the person who hand-wrote these words on Exhibit 20 was Bill Johnson.

124.    Since she had received no response to her July 8, 2020 email, Plaintiff sent a follow-up email on July 13, 2020, a copy of which is contained with the email string attached hereto as Exhibit 20.

125.    On July 15, 2020, Defendant, through its Administrative Partner, Bill Johnson, sent Plaintiff an email, a copy of which is included in the email string attached hereto as Exhibit 21.

126.    Exhibit 21 is a true and accurate copy of emails between Bill Johnson and Plaintiff.

127.    Mr. Johnson's July 15, 2020 email (contained within Exhibit 21) had the subject "FMLA" and provided that:

Julia:

Greg and Jody have made me aware of your FMLA coming to an end as well as your request to either extend your FMLA or be approved to work from home. We will extend your FMLA for 30 days, through August 16th. I do need to note that we are not required to hold your job after July 16th. If a position is available after this date and you are ready to return on site and work in the office, we will consider you for any openings we may have at that time.

Working remotely causes undue hardship to the firm. A legal assistant's position simply can't be done 100% remotely without causing additional hardship to the firm and your co-workers.

128.    Defendant failed to correctly calculate the date upon which Plaintiff's FMLA leave would end; after Plaintiff's paid time off ended at the end of the day on Monday, April 27, 2020, even if Plaintiff had not been entitled to paid FFCRA leave, Plaintiff was entitled to 12 weeks of FMLA leave, which would have ended at the end of the day on Monday, July 20, 2020; Plaintiff was entitled to two weeks of paid FFCRA leave, and, accordingly, was entitled to FMLA leave until the end of the day on Monday, August 3, 2020.

129.    Upon information and belief, a factor contributing to Defendant failed to correctly calculate the end date of Plaintiff's FMLA was because Defendant failed to create or provide to Plaintiff the notices required by 29 C.F.R. § 825.300.

130.    Upon information and belief, as evidenced by the earlier hand-written notation on Exhibit 20 that "We are not going to hold your job," and consistent with the actual language of the July 15, 2020 email (included in Exhibit 21) of Mr. Johnson (who, again, is a lawyer), Defendant intended at the time of sending Mr. Johnson's July 15, 2020 email to consider Plaintiff on and after July 17, 2020 as no longer an employee of Defendant, but instead as only a person who could apply for a position, if one was available.

131.    Plaintiff responded to Mr. Johnson's July 15, 2020 email with an email Plaintiff sent on July 16, 2020, a true and accurate copy of which is included in the email string attached hereto as Exhibit 21.

132.    In Plaintiff's July 16, 2020 email included in Exhibit 21, Plaintiff pointed out that Defendant was violating the FMLA by not allowing Plaintiff to return to her position following her FMLA leave.

133.    In Plaintiff's July 16, 2020 email included in Exhibit 21, Plaintiff also complained of, and refused to remain silent about, Defendant's violation of the general duty clause of the federal Occupational Safety and Health Act by unreasonably failing to protect Defendant's employees, including those in Defendant's Brentwood office, from hazards in the workplace, including unreasonably failing to protect employees from unnecessary COVID-19 exposure.

134.    Defendant did not respond to Plaintiff's July 16, 2020 email until Mr. Johnson sent an email to Plaintiff on July 22, 2020, a true and accurate copy of which is included in the email string attached hereto as Exhibit 21.

135.    Mr. Johnson's July 22, 2020 email (included in Exhibit 21) was the first time Defendant communicated to Plaintiff that Defendant intended to require Plaintiff certification of her condition in order to return following her FMLA leave or, in the words of Mr. Johnson's July 22, 2020 email (included in Exhibit 21) "to provide proof (i.e. a medical certification) of your ability to return to work at the end of your FMLA leave."

136.    Upon information and belief, Mr. Johnson included the certification requirement because he believed that Defendant could try to utilize the certification requirement as an impossible condition; specifically, during the COVID-19 pandemic when most reasonable persons had anxiety to some extent regarding COVID-19, Mr. Johnson framed the certification in his July 22, 2020 email (included in Exhibit 21) as a "doctor's note showing that you… have been treated for your anxiety."

137.    Contrary to Mr. Johnson's later assertion in the same July 22, 2020 email (included in Exhibit 21) that "you were not terminated effective July 16, 2020 nor has any decision been made to terminate you", at the time of Defendant sending Mr. Johnson's July 22, 2020 email (included in Exhibit 21), Defendant considered Plaintiff to no longer be entitled to return to her

position, and, effectively, to be terminated but subject to re-hire if Defendant chose to re-hire her (which it as of July 22, 2020 believed it would never do), as evidenced by Mr. Johnson's statement that since Plaintiff did not provide to Defendant by July 16, 2020 a medical certification of her ability to return to work (something she had never been informed she would be required to do), "we are not required to hold your position open for you in the event we need to hire a legal assistant to do your work in your stead. If you do provide a doctor's note certifying that you are ready and able to return to work by August 16, 2020 (i.e. after your month of extended leave), we will consider you for any openings the firm has at that time."

138.    Defendant's view at the time of Mr. Johnson's July 22, 2020 email was that Plaintiff's rights were not those of an employee entitled to return to work at the end of FMLA leave, or even those of any job applicant for a vacant position with Defendant; instead, Defendants position was that Defendant was entitled to treat Plaintiff as having less rights than those of any other job applicant, because Defendant's position was that, in addition to having to apply for a vacant opening (like any other applicant), Plaintiff, because of Plaintiff's previous FMLA application, also would have to provide a medical certification of her ability to work (something an applicant would not have to provide).

139.    In Mr. Johnson's August 22, 2020 email (included in Exhibit 21), Mr. Johnson complained that "[f]rankly, you have been given the most accommodation of any legal assistant in the COVID-19 era, and you have also caused the most discourse and turmoil."

140.    Despite Defendant's illegal actions, Plaintiff sought to communicate with Defendant on Monday, August 17, 2020 by calling Ms. Scott.

141.    However, Ms. Scott did not answer Plaintiff's call.

142.    Plaintiff therefore left a voicemail asking Ms. Scott to call Plaintiff to discuss Plaintiff's employment.

143.    Upon information and belief, Defendant received and reviewed Plaintiff's voicemail, but decided to pretend that it had not received the voicemail.

144.    Consistent with this pretense, Ms. Scott did not return Plaintiff's call; indeed, Defendant did not contact Plaintiff in any way on August 17, 2020 to inquire about Plaintiff's intentions to return to work, to discuss reasonable accommodations, or to otherwise attempt to cooperate with Plaintiff toward a goal of returning Plaintiff to work.

145.    Instead, on Tuesday, August 18, 2020, Ms. Scott, on behalf of Defendant, sent Plaintiff an email, a copy of which is attached as Exhibit 22, stating that "[s]ince you did not return to work yesterday as we anticipated, I have attached a State of Tennessee Notice of Separation to finalize the employee/employer relationship."

146.    Ms. Scott attached to that email a "Separation Notice" which stated that the reason for Plaintiff's separation was "Quit" and that "Employee didn't return to work"; a true and accurate copy of the Separation Notice is attached as Exhibit 23.

**COUNT I – TERMINATION IN RETALIATION FOR ASSERTING FMLA RIGHTS**

147.    Plaintiff requested that Defendant provide Plaintiff with leave under the FMLA.

148.    Plaintiffs' request that Defendant provide Plaintiff with leave under the FMLA was an invocation by Plaintiff of rights under the FMLA.

149.    Defendant terminated Plaintiff because Plaintiff invoked and/or attempted to exercise and/or invoke rights under the FMLA.

150.    In other words, Plaintiff was terminated as a direct result of, and in retaliation for, her request for FMLA leave.

151.    In the alternative, Defendant used Plaintiff's request for FMLA leave as a negative factor in deciding to terminate Plaintiff's employment.

152.    Defendant's termination of Plaintiff's employment damaged Plaintiff, including causing her to suffer lost wages.

153.    As a result of Defendant's illegal termination of Plaintiff, Plaintiff should be reinstated, awarded back pay, front pay, attorney's fees and liquidated damages.

## COUNT II – FMLA INTERFERENCE

154.    Defendant failed to comply with the notice requirements of the FMLA, including 29 C.F.R. § 825.300.

155.    Defendant's failure to comply with the notice requirements of 29 C.F.R. § 825.300 caused Plaintiff damage, including the loss of an opportunity to be apprised of (A) her need to prepare to return to work for Defendant with a medical certificate of her ability to work for Defendant, (B) the right to return without such a certificate, if Defendant did not consistently require such certificates of other persons taking similar leaves of absence and (C) the effect of Plaintiff's entitlement to paid leave under the FFCRA, and how the availability of FFCRA paid leave would interact with Plaintiff's FMLA leave and allow Plaintiff to extend her FMLA leave.

156.    Defendant interfered with Plaintiff's FMLA rights by telling Plaintiff, including in Mr. Johnson's July 15, 2020 email, that Defendant would not hold Plaintiff's job, and would instead only "consider [Plaintiff] for any openings that we may have" after July 16, 2020, when Plaintiff's 12 weeks of FMLA leave did not expire until the end of the day on July 20, 2020 (or, if Plaintiff was entitled paid FFCRA leave, until the end of the day on August 3, 2020).

157.    Defendant interfered with Plaintiff's FMLA rights by telling Plaintiff on July 22, 2020 that Defendant intended to require Plaintiff to provide Defendant with a medical certificate

of her ability to work for Defendant before Plaintiff would be permitted to work for Defendant, when Defendant had never before informed Plaintiff that Defendant intended to require Plaintiff to provide Defendant with a medical certificate of her ability to work for Defendant.

158.    Defendant interfered with Plaintiff's FMLA rights by trying to improperly utilize a certification requirement as an impossible condition; specifically, during the COVID-19 pandemic when most reasonable persons had anxiety to some extent regarding COVID-19, Mr. Johnson framed the certification Defendant was demanding Plaintiff obtain prior to returning to work as a "doctor's note showing that you… have been treated for your anxiety" knowing that a doctor could not certify that all anxiety was "treated."

159.    Defendant interfered with Plaintiff's FMLA rights by informing Plaintiff that her FMLA leave was extended, but then violating the fundamental purpose of the FMLA with respect to the extended FMLA leave (that the employee have the right to return to the job following the leave) by stating that Plaintiff would not be entitled to return to her job following the leave or, in Defendant's internal annotations of its plan (as noted on Exhibit 20) "we are not going to hold your job."

160.    As a result of Defendant's FMLA interference, Plaintiff has been damaged, and Plaintiff should be reinstated, awarded back pay, front pay, attorney's fees and liquidated damages.

**COUNT III – VIOLATION OF FAMILES FIRST CORONAVIRUS RELIEF ACT**

161.    Defendant failed to pay Plaintiff for the paid leave Plaintiff was entitled to under the FFCRA and 29 C.F.R. Part 826.

162.    As a right of Defendant's failure to provide Plaintiff with FFCRA paid leave, Plaintiff should be awarded all remedies available under the FFCRA, including but not limited to the unpaid amount to which Plaintiff was entitled, liquidated damages, and attorney's fees.

## COUNT IV – TERMINATION IN VIOLATION OF TENNESSEE DISABILITY ACT

163.    Defendant discriminated against Plaintiff on the basis of her disability and/or perceived disability and violated the Tennessee Disability Act, including by terminating Plaintiff based on her disability and/or perceived disability.

164.    Defendant's termination of Plaintiff damaged Plaintiff, including causing her to suffer lost wages and emotional distress.

165.    As a result of Defendant's violations of the Tennessee Disability Act, the Plaintiff should be awarded all remedies available under the Tennessee Disability Act, including reinstatement, compensatory damages (including for Plaintiff's emotional distress), back pay, front pay, pre-judgment interest, and attorney's fees.

## COUNT V – TERMINATION IN VIOLATION OF TENNESSEE PUBLIC PROTECTION ACT

166.    Plaintiff refused to remain silent about Defendant's illegal activity, including Defendant's violation of the general duty clause of the Occupational Safety and Health Act and/or Defendant's violation of the Americans with Disabilities Act in connection with its refusal to permit Plaintiff and other employees to work remotely in light of an unprecedented pandemic.

167.    Defendant terminated Plaintiff in violation of the Tennessee Public Protection Act, T.C.A. § 50-1-304, in retaliation for Plaintiff's refusal to remain silent about Defendant's illegal activity.

168.    Defendant terminated Plaintiff's employment solely for Plaintiff's refusal to remain silent about Defendant's illegal activity.

169.    Defendant's termination of Plaintiff damaged Plaintiff, including causing her to suffer lost wages and emotional distress.

170.    Defendant's violation of the Tennessee Public Protection Act were intentional and/or malicious.

171.    As a result of Defendant's violations of the Tennessee Public Protection Act, the Plaintiff should be awarded all remedies available under the Tennessee Public Protection Act, including reinstatement, compensatory damages (including for Plaintiff's emotional distress), back pay, front pay, pre-judgment interest, and attorney's fees.

Wherefore, Plaintiff respectfully prays that Plaintiff be awarded the following relief and all other relief to:

A.    Trial by jury;

B.    Judgment against the Defendant on all claims asserted herein;

C.    Compensatory damages including but not limited to past and future wages and past and future lost benefits;

D.    Compensatory damages including but not limited to emotional distress, mental anguish, humiliation and embarrassment;

E.    Punitive damages under the Tennessee Public Protection Act to punish and deter similar future unlawful conduct;

F.    Injunctive relief, including reinstatement, front and back pay;

G.    An award of statutory attorney fees, costs and expenses;

H.    Statutory interest on all damage awards, verdicts or judgments; and

I.    Any other relief to which Plaintiff may be entitled, or which is otherwise deemed appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
MFoster@MarkNFoster.com
*Counsel for Plaintiff*